Mr. Justice NELSON,
dissenting :
I am unable to concur in the judgment of the court in tnis cáse; and shall proceed to, state briefly the grounds of my dissent, without entering upon the argument or discussion in support of them.
I think. the proof sufficient to show, that the purpose of the master was to break the blockade of the port of New Orleans, and that it existed from the inception of the voyage: but, in my judgment, the defect in the ease, on the part of the captors, is that no blockade existed at the port of New Orleans at the time the seizure was made. The city was reduced to possession by the naval forces of the United States, on the 25th of April preceding the seizure, and Forts Jackson and St. Philip on the 23d of the same month. They were situated on the opposite banks of the Mississippi Kiver, about one-third of the way up to the city from its mouth. Admiral Farragut announced to the Government the capture and possession of the city on the day it took place, 25th of April, and General Butler, of the capture of the forts on the 29th. The latter announced, that the enemy had abandoned all their defensive works in and around New Orleans, including Forts Pike and ‘Wood, on Lake Pontchartrain, *156 and Fort Livingston on Barataría Bay; and bad abandoned everything-up the river as far as Donaldsv-ille, some seventy miles beyond New Orleans. The authority of the Government of the United States had been restored over thé city and its inhabitants; and over the Mississippi Bive’r, and both of its banks and the inlets to the same, from the ocean or gulf, including, also, the passage for vessels by the way of Lakes -Borgne and Pontchartrain, the usual channel for vessels engaged in the coasting trade to and from New Orleans. A.nd on the 1st of May, General Butler announced by proclamation, that the city of. New Orleans and its environs, with all its interior aiid exterior defences, having surrendered to the combined land and naval forces of the United States, and lieing now in the occupation of these forces, the Major-General commanding hereby proclaims the objects and purposes of the United States in thus taking possession, &c., and the rules and regulations by which the laws of the United States would be, for the present, and during the state of war, enforced and maintained. The seizure of the vessel and cargo was made between Matanzas and Havana, on the 4th of May, several days after the city and port of New Orleans were reduced, and full authority of the United States extended and held over them.
A blockade under the law of nations is a belligerent right, and its establishment an act of war upon the nation whose port is blockaded. One of the most important of the belligerent rights is that of blockading the enemy’s ports, not merely to compel the surrender of the place actually attacked or invested, but, as ■ a means, often the most effectual, of compelling the enemy, by the pressure upon his financial and commercial resources, to listen to terms of peace. The object of a blockade, says Chancellor Kent, is not merely to prevent the importation of supplies,- but to prevent export as well as import; and to cut off all communication .of commerce with the blockaded port.
Now, the capture and possession of the port of the enemy by the blockading force, or by the forces of the belligerent, in the course of the prosecution of the war, puts an end to *157 the blockade and all the penal consequences growing out of this measure to neutral commerce. The altered condition of things, and state of the war between the two parties in respect to the besieged port or town,.makes the continuance of the blockade inconsistent with the code of international' law on the subject; as no right exists on the part of the belligerent as against the neutral powers to blockade his own ports. Thisv principle was recognized and applied by Sir W. Scott in the casé of The Trende Soztre, decided in 1807.* She was a Danish vessel and was on a voyage to the Cape of Good Hope, then tbe port of an enemy, with contraband articles on board, and was seized as a prize of war; but the vessel had arrived at the Cape after that settlement had surrendered to the British forces. The counsel for the captors insisted, that though the settlefaent had become British, the penalty would not be defeated, as the intention and the act continued the same; that there was no case in which such a distinction had been allowed ondhe question of contraband. “The distinction,” it was remarked, “which had been admitted in blockade easeá, stood altogether on particular grounds, as arising out of a class of cases depending on the blockade of neutral ports, in which the court had expressed a disposition to admit all favorable distinctions.” The court, in delivering its opinion, observes : “If tbe port had continued Dutch, a person could not have been at liberty to carry thither articles of a contraband nature, under an intention of selling other innocent,commodities only, and of proceeding with the contraband articles to a port of ulterior destination. But before the ship arrives, a circumstance takes place which completely discharges the whole of the j*uilt. Because* from the moment when the Cape became a British possession, the goods lost their nature of contraband. They were , going into the possession of a British settlement; and the consequence of any pre-emption that could be put upon them, would be British pre-emption.” The court also observed: “It has been said, that this, is a *158 principle which the court has not applied to cases of contraband; and that the'court, in applying it to cases of blockade,' did it only in consideration of the particular hardships consequent on that class of cases. But 1 am not aware óf any material distinction; because the principle on which the court proceeded was, that there must be a delictum, existing at the moment of the seizure to sustain the penalty.” “ I am of opinion, therefore,” the -judge says, in conclusion, “that the .same rule does apply to cases of contraband, and upon the same principle on which it has been applied- in those of blockade.” See also the casé of The Lisette * and of The Ahby;† in which the same principle is declared, and one of- them a ease of blockade. .
The cessation of the blockade necessarily resulted from the capture and possession of the port and town of New Orleans. They no longer belonged to the enemy, nor were under its dominion, but were a port and town of the United States. They had become emphatically so, for the capture was not that of the territory of a foreign nation to which we had obtained only the right and title of a conqueror; but the conquest was over our own territory, and over our own people, who had by illegal combinations, and mere force, and violence, subverted the laws and usurped the authority ofN the (general Government. The capture-was but the restoration of the ancient possession, authority, and laws of the country, the continuance and permanency of which; so far as the right is involved, depend not on conquest,' nor on the success or vicissitudes of armies; but upon the Constitution of the United States, which extends over every portion of the Union, and is the supreme law of the land. The doubt, therefore, that arose in the case of the Thirty Hogsheads of Sugar v. Boile,‡ and which was solved by Chief Justice Marshall, and related to the ease of a foreign conquest, cannot arise in this case. The Chief Justice observed, “ Some doubt has been suggested whether Santa Cruz, while in possession of Great Britain, could properly be considered a British *159 island. But for this doubt there can be no foundation. Although acquisitions .made during war are not considered permanent until confirmed by treaty; yet, to every commercial and belligerent purpose they áre considered as part of the domain of the conqueror, so long as he retains the possession and government of them. The Island of Santa Cruz, after the capitulation, remained a British island until it was restored to .Denmark.” Now, as we-, have seen, it is not necessary to invoke this doctrine in a case where the capture is of territory previously belonging to the sovereign power acquiring it, and which is retaken and held under the organic law and authority ot that power.
I have said, that the cessation of the blockade in question resulted from the capture and repossession of the port and town of blew Orleans, and that there was no longer an enemy’s port or town to be blockaded. In addition to this, the moment the capture took place, and the authority of the United States whs established, the municipal laws of that government took the place of the international 'law upon which the blockade rested. The reason for .its continuance no longer existed: it had accomplished its object as one of the coercive measures against the enemy to compel a surrender. So far as intercourse with the town became material, whether commercial or , otherwise, after the capture and possession, it was subject to regulation by the municipal laws, and which is much more efficient and absolute and less expensive than the measure of blockade. It is true, these laws cannot operate extra-territorially; but within the limit of the jurisdiction, and which extends to a marine league from the coast, their control over all intercourse with the port or town is complete. Seizures of neutral vessels and cargo on the high seas are, indeed, not admissible, but blockades' are not established for the purpose of these seizures; they-are but incidental to the exercise of the belligerent right against the port of the enemy.
The proclamation.of the President of the 12th of May, 1862, which announces that the blockade of the port of New Orleans shall cease after the 1st .of June following, has been *160 referred to as evidence of. its continuance to that period. But .J think it will be difficult to maintain the position upon any principle of international law, that the belligerent may continue a blockading force at the port after it has not only ceaséd to be an enemy’s, but has become a port of its own. It is not necessary that 'the belligerent' should give notice of the capture of the town, in order to put in operation ■ the municipal laws of the place against neutrals. The act is- a. public event of which foreign nations are bound, to take no.-tice, and .conform their intercourse to the local laws. The same principle applies to the blockade, and the effect of the capture- of the port upon it. The event is public and notorious, and the effect and consequences of the change in the' state of war upon the blockading force well understood.
I have-felt it a duty to state the grounds of my dissent in this case, not on account of the amount of property involved, though that is considerable,'or from any particular interests connected.with the case, but from a conviction that.there is a tendency, on the part of the belligerent, to press the right of blockade beyond its proper limits, and thereby unwittingly aid in the establishment of rules that are often found inconvenient, and felt as a hardship, when, in the course of events, the belligerent has become a neutral.. I think the application of the law of blockade, in the present case, is a step in that direction, and -am, therefore, unwilling to give it my concurrence.
[See infra, p.'258, The Venice; a case, in some senses, snppletory or com-plementa! to tie present one.]

 6 Robinson, 390, n.

 6 Robinson, 387.

 5 Id. 251.

 9 Cranch, 191.